NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**EMERALD CITIES COLLABORATIVE, INC.,**
*Appellant*

**v.**

**SHERI JEAN ROESE,**
*Appellee*

---

2016-1703

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91197060.

---

Decided: December 13, 2016

---

LAWRENCE EDWIN JAMES, JR., Reed Smith LLP, Chicago, IL, for appellant. Also represented by JOSHUA NEWMAN.

SHERI JEAN ROESE, Emerald Cities USA Ltd, Scottsdale, AZ, pro se.

---

Before PROST, *Chief Judge*, LOURIE and MOORE, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Emerald Cities Collaborative, Inc. ("ECC") appeals from the decision of the United States Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("the Board") cancelling ECC's trademark registration of THE EMERALD CITY and dismissing ECC's opposition to an application filed by Sheri Jean Roese ("Roese") to register the mark EMERALD CITIES. *See Emerald Cities Collaborative, Inc. v. Roese*, No. 91197060 (T.T.A.B. Dec. 4, 2015) ("*Board Decision*"). Because the Board did not err in determining that the 2009 agreement between ECC and Perry Orlando ("Orlando") regarding the mark THE EMERALD CITY prior to its registration constituted an assignment of the intent-to-use application for that mark in violation of Section 10 of the Lanham Act, 15 U.S.C. § 1060(a)(1), we *affirm*.

BACKGROUND

I

In November 2008, Orlando filed an application at the PTO, seeking to register the mark THE EMERALD CITY for use in business development and consulting services in the renewable energy industry. The application was an intent-to-use application under 15 U.S.C. § 1051(b). On November 24, 2009, the PTO issued a Notice of Allowance, which commenced a six-month period for Orlando to file a Statement of Use ("SOU") as required for registration of the mark.

Before filing the SOU, on December 30, 2009, Orlando and ECC entered into an agreement concerning Orlando's applied-for mark ("the Agreement"). J.A. 212–17. The Agreement is entitled "Trademark Assignment and License," J.A. 212, is governed by the laws of Delaware, J.A. 216, and has "an *effective date* of [December] 30, 2009," J.A. 212 (emphasis added).

The Agreement recites that "Orlando owns certain rights in the Mark, The Emerald City, U.S. Trademark Application Serial No. 76/684,594 (the 'Mark')" and further provides the following:

> Assignment. Mr. Orlando agrees to convey and assign unto ECC, all right, title and interest in and to the Mark and any and all derivatives thereof, together with any and all goodwill associated therewith, and the right to sue and recover damages and profits for past, present and future infringement, if any, related to the Mark, *at such time as the Mark is registered at the* [*PTO*]. . . .
>
> Use. Between the Effective Date and the Registration Date, Mr. Orlando *may continue to use* the Mark. . . .
>
> License. Upon registration of the Mark by the [PTO] and completion of the transfer of the Mark to ECC, ECC agrees to license certain rights in the Mark to Mr. Orlando . . . .

J.A. 212–13 (emphases and underline added).

The Agreement additionally provides that: (1) "ECC shall promptly pay" Orlando $25,000; (2) "[u]pon payment of such amount, Mr. Orlando appoints Joel Rogers[, ECC's cofounder ("Rogers"),] as his Power of Attorney (with the full power of substitution and resubstitution) for the limited purpose of *allowing ECC (and its attorneys) to take over continued prosecution of the application for the Mark*"; (3) "[t]he Power of Attorney . . . is a Durable Power of Attorney and is *irrevocable*"; (4) "[u]pon ECC's request[,] Mr. Orlando agrees to execute any additional documents as may be reasonably required to effect and/or record this new Power of Attorney and to use reasonable effort *to assist ECC and its attorneys with the prosecution of the application*, satisfying the [PTO]'s requirement for use of the Mark in commerce, and ensure registration of

the Mark in a timely manner"; and (5) "Orlando agrees to use the Mark . . . by January 31, 2010 and provide evidence of such use in the form of a specimen and date of first use to ECC *to assist ECC in its registration of the Mark.*" J.A. 213 (emphases added). Under the Agreement, ECC also agreed to pay Orlando $40,000 as a final installment upon registration of the mark at the PTO. *Id.*

Moreover, the Agreement states that "[t]his Agreement shall *commence on the Effective Date* . . . and shall continue in perpetuity," that either party may terminate the Agreement if the other party materially breaches, and that "[u]pon termination of this Agreement by ECC . . . *Orlando shall promptly cease use of the Mark.*" J.A. 214 (emphases added). It further provides:

> The products and services sold by Mr. Orlando and his associated entities under the Mark shall *at all times* be of a high quality, as determined by ECC acting reasonably. If the products or services sold by Mr. Orlando and his associated entities under the Mark fail to meet such quality standards, Mr. Orlando shall immediately take corrective action to ensure that the products or services are of the appropriate quality. . . .

> Mr. Orlando shall not challenge ECC's use of the Mark or support challenges by third parties, *whether before or after the Registration Date. Only* ECC shall have the *exclusive right* to file oppositions or claims against the users of confusingly similar trademarks. . . .

> ECC shall be responsible for all payments in connection with the continued prosecution of the Mark in the United States or its possessions. . . .

J.A. 215 (emphases added).

On April 19, 2010, approximately four months after the Agreement, the applicant filed the SOU, which con-

tained an appointment of counsel to attorneys at Reed Smith LLP, the law firm representing ECC in this appeal. The SOU stated that THE EMERALD CITY was first used in commerce at least as early as January 15, 2010. The PTO accepted the SOU and registered the mark under Trademark Registration No. 3814868 on July 6, 2010. Later that month, an assignment, which was executed by Orlando and ECC on July 6, 2010, was recorded at the PTO, indicating that Orlando assigned the entire interest in the mark to ECC "with an effective date of July 6th 2010 . . . pursuant to that certain 2009 Trademark Assignment and License Agreement." J.A. 218–19.

II

In September 2009, Roese filed an application at the PTO, seeking to register the mark EMERALD CITIES. Shortly after publication of Roese's application in October 2010, ECC filed an opposition alleging that Roese's mark would likely cause confusion with ECC's then-registered mark THE EMERALD CITY. In response, Roese raised several affirmative defenses, as well as a counterclaim, seeking to cancel ECC's registration of THE EMERALD CITY. She alleged, *inter alia*, that ECC's registration is invalid because the Agreement between Orlando and ECC violated 15 U.S.C. § 1060(a)(1). J.A. 42 (affirmative defense); J.A. 46 (counterclaim).

The Board ruled that the Agreement constituted an improper assignment of the intent-to-use application in violation of § 1060(a)(1). *Board Decision* at 12–17. In particular, the Board rejected ECC's argument that the Agreement was merely an "agreement to assign in the future." *Id.* at 13. Rather, based on the Agreement and the deposition testimony of Rogers, ECC's cofounder, the Board concluded that "the ramifications of the Agreement were such that Mr. Orlando relinquished, and [ECC] acquired, control of the application and use of the involved mark, in [a] manner tantamount to an assignment

of ownership of the application." *Id.* at 17. The Board also found that the 2010 assignment recorded at the PTO after registration was "merely a formality or confirmation of a *fait accompli* resulting from the Agreement." *Id.* The Board therefore granted Roese's request to cancel ECC's trademark registration. Moreover, because ECC's likelihood-of-confusion claim was based solely on its asserted rights in the pleaded registration, not on any prior common law rights, the Board dismissed ECC's opposition. *Id.* at 17–18.

ECC timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## DISCUSSION

We review the Board's legal conclusions without deference and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). The fundamental question in this appeal is the proper interpretation of the Agreement, and hence whether it constituted an assignment in violation of 15 U.S.C. § 1060(a)(1). The proper interpretation of a contract is a question of law that is reviewed *de novo*. *First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011).

Here, the parties do not dispute that the Agreement is governed by Delaware law. "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). When interpreting a contract, a court "give[s] priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Id.* at 368. Accordingly, "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme

and plan." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

ECC argues that the Board erred in construing the Agreement as an immediate assignment, and therefore that it was not in violation of § 1060(a)(1). ECC contends that the Agreement shows that ECC and Orlando intended to assign the mark only upon registration, and that the Board's interpretation disregarded and contradicted the intention of the parties. ECC also argues that the Board erred in interpreting the provisions relating to (1) ECC's right to oversee the quality of products sold under the mark, and (2) ECC's exclusive right to enforce the mark against third parties, as evidence of an immediate assignment. According to ECC, those provisions only applied after registration. ECC also contends that the Power of Attorney merely created an agent-principal relationship between Orlando, the trademark owner, and the appointed representative. ECC argues, moreover, that the Board improperly relied on Rogers's ambiguous deposition testimony in interpreting the Agreement. Lastly, ECC contends that the Board improperly acted as de facto counsel for Roese, who was a *pro se* litigant.

Roese, proceeding *pro se* in this appeal, responds that the Board properly construed the Agreement as an immediate assignment of the intent-to-use application in violation of Section 10 of the Lanham Act.

We agree with the Board and Roese that the Agreement, when construed as a whole, constituted an immediate assignment of Orlando's intent-to-use application before the filing of the SOU, which rendered the subsequent registration of THE EMERALD CITY invalid.

Section 10 of the Lanham Act, 15 U.S.C. § 1060(a)(1), contains an anti-trafficking rule, which provides that:

> [N]o application to register a mark under section 1051(b) of this title shall be assignable prior to

the filing of an amendment under section 1051(c) of this title to bring the application into conformity with section 1051(a) of this title or the filing of the verified statement of use under section 1051(d) of this title, except for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing.

Section 1060(a)(1)'s anti-trafficking rule prohibits the assignment of an intent-to-use application prior to the filing of an SOU, unless a statutory exception is met, *viz.*, that the intent-to-use application is transferred with at least part of the applicant's "ongoing and existing" business to which the mark pertains. As the Board found, and ECC does not dispute, such statutory exception does not apply to ECC. *Board Decision* at 13 n.23. The question, then, is whether the Agreement constituted an improper assignment of the intent-to-use application prior to the filing of the SOU on April 19, 2010. We conclude that it did.

On its face, the Agreement provides that it has an "effective date" of December 30, 2009, J.A. 212, and that it "shall commence on the Effective Date," J.A. 214. On the other hand, the Agreement also provides that "Orlando agrees to convey and assign . . . the Mark . . . *at such time as the Mark is registered at the* [*PTO*]," J.A. 212, and that upon registration, ECC agrees to license certain rights to Orlando, *id.*, which might suggest that Orlando retained ownership of the intent-to-use application at least until registration of the mark on July 6, 2010. However, we must construe the Agreement as a whole. In doing so, we reach the same conclusion as the Board that the overall scheme and plan of the Agreement is that, by virtue of its execution, Orlando relinquished, and ECC acquired, immediate control and ownership over the intent-to-use application and the associated mark.

First, the Agreement grants an *irrevocable* Power of Attorney to Rogers, ECC's cofounder, with the *full* power of substitution and resubstitution, "for the limited purpose of allowing ECC (and its attorneys) to take over continued prosecution of the application." J.A. 213. It requires Orlando "to *assist ECC and its attorneys* with the prosecution of the application" and "to *assist ECC in its registration* of the Mark." *Id.* (emphases added). Thus, rather than establishing an agent (Rogers) and principal (Orlando) relationship under a standard Power of Attorney, the contract language here indicates that Orlando ceded control over the intent-to-use application to ECC and instead became obligated to assist ECC in *its* registration of the applied-for mark.

Second, as the Board noted, the Agreement provides that, after the Agreement "commence[d] on the Effective Date," in the event of termination by ECC, "Orlando shall promptly cease use of the Mark." J.A. 214. That language is inconsistent with the interpretation now advocated by ECC that Orlando retained ownership between the effective date and the registration date. Indeed, the Agreement provides that Orlando "*may* continue to use" the mark during that period, J.A. 213 (emphasis added), and gives ECC the right to ensure that Orlando's products sold under the mark "shall *at all times* be of a high quality," J.A. 215 (emphasis added). The contract language thus signals that, by virtue of the Agreement, ECC acquired an ownership interest, including the right to control the quality of goods and services sold under the mark by a licensee, and Orlando became such a de facto licensee.

Third, the Agreement provides that Orlando "shall not challenge ECC's use of the Mark or support challenges by third parties, *whether before or after the Registration Date*." J.A. 215 (emphasis added). That language again reinforces the interpretation that ECC became an owner, and Orlando only a licensee, well before the registration

date. Indeed, the next sentence states: "*Only* ECC shall have the *exclusive right* to file oppositions or claims against the users of confusingly similar trademarks." *Id.* (emphases added). Notably, the contract does not limit ECC's exclusive right to enforce the mark to a particular period, such as only after the registration of the mark.

We are unpersuaded by ECC's argument that the quality-control and right-to-enforce provisions only apply upon registration of the mark. Although it is true that certain provisions in the Agreement contain the language "[u]pon registration of the Mark by the [PTO] and completion of the transfer of the Mark to ECC," J.A. 213–14 (Sections 2.2 (Final Payment), 2.3 (License), 3.1 (Grant of License)), that language does not appear anywhere in the quality-control or right-to-enforce provision. Instead, as indicated, the quality-control provision says "at all times," and the immediately preceding sentence to the exclusive-right-to-enforce provision states "whether before or after the Registration Date." J.A. 215. ECC's argument is thus contrary to the plain language of the Agreement.

ECC also argues conclusorily that the Agreement did not result in the transfer of all rights in the mark. Appellant's Br. 10. The only such unassigned right ECC identifies, however, is "the right to sue and recover damages and profits for past, present and future infringement." *Id.* at 19–20 n.6 (citing J.A. 212) (Assignment provision). We find ECC's argument to be without merit. Although the Assignment provision does state that Orlando agrees to assign the right to sue, along with other rights, "at such time as the Mark is registered at the [PTO]," J.A. 212, the contract clearly provides that "[o]nly ECC shall have the exclusive right to file oppositions or claims" against third parties, J.A. 215, and that Orlando may not challenge ECC's use of the mark "whether before or after the Registration Date," *id.* When read as a whole, the Agreement did *not* reserve the right to sue to Orlando for the period between the effective date and the registration date.

Accordingly, we conclude that the Agreement, when read in its entirety, unambiguously shows that, by virtue of its execution, ECC acquired, and Orlando relinquished, immediate control and ownership of the intent-to-use application in a "manner tantamount to an assignment." *Board Decision* at 17. Because the Agreement itself is clear and unambiguous, we need not consider whether Rogers's deposition testimony supports or contradicts the Board's and our interpretation of the Agreement. *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

Lastly, because the Agreement violated § 1060(a)(1), we further conclude that the Board did not err in cancelling the registration of the mark THE EMERALD CITY. *See, e.g.*, *Oculu, LLC v. Oculus VR, Inc.*, No. 14-0196, 2015 WL 3619204, at *7 (C.D. Cal. June 8, 2015) ("Violating this 'anti-trafficking rule' [of § 1060(a)(1)] voids the assignment as well as the underlying application and resulting registration.") (citing *The Clorox Co. v. Chemical Bank*, 40 U.S.P.Q.2d (BNA) 1098, 1104 (T.T.A.B. 1996)). Moreover, because ECC's opposition to Roese's application was based solely on the now-canceled registration, the Board properly dismissed ECC's opposition.

## CONCLUSION

We have considered the parties' remaining arguments, but find them to be unpersuasive. For the foregoing reasons, we affirm the Board's decision cancelling the registration of THE EMERALD CITY and dismissing ECC's opposition.

**AFFIRMED**